UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**HOPE GLENN, as the Personal**
**Representative of the ESTATE**
**OF LUKUS GLENN,**

                              No. CV 08-950-MO

                Plaintiff,

                             AMENDED OPINION AND ORDER

      v.

**WASHINGTON COUNTY, et al.**,

                Defendants.

**MOSMAN, J.,**

      Hope Glenn filed this lawsuit against Washington County Deputies Mikhail Gerba and

Tim Mateski fatally shot her son, Lukus Glenn, during an incident at her home. She alleges a

claim under 42 U.S.C. § 1983 for a violation of Lukus Glenn's Fourth Amendment rights, as well

as an Oregon state law tort claim for wrongful death. Defendants Washington County, Deputy

Gerba, and Deputy Mateski filed a Motion for Summary Judgment (#38).[1] Because the

Constitution does not prohibit officers from using less-lethal or lethal force when a suspect holds

a knife and the officers reasonably believe he poses an immediate threat to nearby potential

victims, I GRANT Defendants' Motion for Summary Judgment.

---

     [1] Ms. Glenn also sued the City of Tigard and City of Tigard Police Officer Andrew
Pastore, but those defendants were later dismissed from the case.

## FACTUAL BACKGROUND

The material facts in this case are largely undisputed. To the extent there are disputed

facts, I view the facts—and inferences from those facts—in the light most favorable to plaintiff.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Eighteen-year-old Lukus Glenn[2] returned to his family's home around 3:00 AM on the

morning of September 16, 2006. He was "agitated, drunk and intent on driving his motorcycle."

(Brad Glenn Decl. (#71) ¶ 2; Hope Glenn Decl. (#75) ¶ 6.) It was later determined that Lukus

Glenn had a blood alcohol level of .18%. (Wagner Decl. (#45) Ex. 3 at 2.) When his parents,

Hope and Brad Glenn, told him he was too intoxicated to drive, Lukus became angry and began

to break windows in the family's house and in the cars parked in the family's driveway. (Brad

Glenn Decl. (#71) ¶ 2.) He held a knife to his throat and threatened to kill himself. (Hope Glenn

Decl. (#75) ¶ 8.)

Hope Glenn called 9-1-1 and asked for help with her son, whom she described as "out of

control," "really, really intoxicated," and "suicidal." (9-1-1 Call.[3]) Hope told the 9-1-1 operator

that Lukus "has a knife," is "threatening us," that he had smashed her car windows with a shovel,

that he "says he's not leaving until the cops shoot him and kill him," and that he "just keeps

threatening to kill everybody." (*Id.*) She said Lukus had "busted our front door," so the family

could not secure the house, but she thought she was safe "unless he [Lukus] starts running in

here." (*Id.*) She later said she "shouldn't have called [9-1-1], but [she] was so scared." (*Id.*)

---

[2]  The facts of this case involve Lukus Glenn and his parents, Brad and Hope Glenn. To avoid confusion, I refer to these individuals by their full names or by their first names.

[3]  Citations to "9-1-1 Call" refer to plaintiff's Exhibit 1, the audio recording of Hope Glenn's 9-1-1 call on September 16, 2006, which was conventionally filed with the Court. (Cox Decl. (#79) Ex. 1.)

The 9-1-1 dispatcher relayed this information to the Washington County Sheriff's Department, stating that officers were needed at the Glenn home because there was a "domestic disturbance—fight with a weapon." (WCCCA Dispatch Recording[4]; Pl.'s Resp. to Def. Washington County's CSMF (#69) 7.) The dispatch call center informed the officers that there were hunting rifles in the house, but Lukus could not get to them. (WCCCA Dispatch Recording.) On the WCCCA Dispatch Recording, an officer can be heard asking whether the complainants can lock the doors to their house, since he "doesn't want the son going inside if there are guns in there." (*Id.*) In response, the 9-1-1 dispatcher informed the officers that the door could not be locked because Lukus had "busted through the front door." (*Id.*; Pl.'s Resp. to Def. Washington County's CSMF (#69) 13, 16.) The 9-1-1 dispatcher also told the responding officers that Lukus said he would not leave until the officers killed him, and that he had threatened to kill himself if the officers "show[ed] up." (9-1-1 Call; WCCCA Dispatch Recording.)

Deputy Gerba was the first law enforcement officer to respond to Hope Glenn's 9-1-1 call. (Brad Glenn Decl. (#71) ¶ 4.) Written information on his mobile data terminal informed him: "son has a knife, broke a vehicle window, has a pocketknife, signal II with tones,[5] son is Glenn, Lukus, 4-22 of '88, threatened to kill himself if officers show up." (Pl.'s Resp. to Def. Washington County's CSMF (#69) 3). When Deputy Gerba arrived, Lukus was standing outside near the family's garage. (Brad Glenn (#71) ¶ 4.). Deputy Gerba positioned himself

---

[4]  Citations to "WCCCA Dispatch Recording" refer to defendant City of Tigard's Exhibit 2, a Washington County Centralized Communications Agency ("WCCCA") audio recording of the dispatch broadcast related to Hope Glenn's 9-1-1 call, which was conventionally filed with the Court. (*See* Mot. for Order Allowing Conventional Filing of Ex. (#37).)

[5]  The signal II with tones "meant that the dispatch center felt the call presented significant officer safety concerns." (Pastore Decl. (#49) ¶ 4.)

approximately eight to twelve feet from Lukus. (Morales Decl. (#73) ¶ 4; Lucas Decl. (#72) ¶ 6; Brad Glenn Decl. (#71) ¶ 4.) Although Lukus was holding a knife to his throat and bleeding, he was "not in a physical altercation with anyone," nor was he actively threatening anyone other than himself. (Brad Glenn Decl. (#71) ¶ 4; Lucas Decl. (#72) ¶ 6; Hope Glenn Decl. (#75) ¶¶ 11-12.) From the moment he arrived, Deputy Gerba drew his gun and "only scream[ed] commands" loudly at Lukus; he did not attempt to cajol or otherwise persuade Lukus to drop the knife voluntarily. (Brad Glenn Decl. (#71) ¶ 5.) Deputy Gerba ordered Lukus to "drop the knife," "get on the ground," and "drop the knife or I'm going to kill you." (Brad Glenn Decl. (#71) ¶ 5; Lucas Decl. (#72) ¶ 8; Hope Glenn Decl. (#75) ¶ 14; Morales Decl. (#73) ¶ 5.) More than once, Deputy Gerba warned Lukus that he would be shot if he did not put the knife down, but Lukus may not have heard or understood these warnings because he was severely intoxicated and "there were so many people yelling." (Pl.'s Resp. to Def. Washington County's CSMF (#69) 12.)

Washington County Sheriff's Deputy Mateski arrived shortly after Deputy Gerba and positioned himself approximately six to twelve feet from Lukus. (Brad Glenn Decl. (#71) ¶ 6; Lucas Decl. (#72) ¶ 8; Morales Decl. (#73) ¶ 6).) When he arrived, Deputy Mateski was aware that he was responding to a 9-1-1 call involving a "fight with a weapon," and that "the suspect was armed with a knife." (Mataski Decl. (#47) ¶ 10; Pl.'s Resp. to Def. Washington County's CSMF (#69) 3, 7.). Deputy Mateski also knew Lukus had broken his parent's door and several windows (Mataski Decl. (#47) ¶ 13; Pl.'s Resp. to Def. Washington County's CSMF (#69) 3, 13, 16), was intoxicated and suicidal, and had no criminal history. (Pl.'s Resp. to Def. Washington County's CSMF (#69) 3.) Like Deputy Gerba, Deputy Mateski drew his gun and began screaming commands as soon as he arrived, including expletives and orders like "drop the knife or you're going to die." (Brad Glenn Decl. (#71) ¶ 7; Hope Glenn Decl. (#75) ¶ 15; Morales

Decl. (#73) ¶ 7.) The deputies repeatedly warned Lukus that he needed to put down the knife or

he would be shot. (Pl.'s Resp. to Def. Washington County's CSMF (#69) 12, 15.) Lukus's family

also implored Lukus to drop the knife. (9-1-1 Call; Mataski Decl. (#47) ¶ 19.) The scene was

chaotic. (Cox Decl. (#74) Ex. 2 at 24:7.)

      Lukus Glenn shouted at the deputies, "You kill me or I kill me." (Brad Glenn Decl. (#71)

¶ 9; Hope Glenn Decl. (#75) ¶ 18.) At some point Deputy Gerba heard Lukus Glenn say, "Shoot

me." (Pl.'s Resp. to Def. Washington County's CSMF (#69) 6.) He asked his parents "if they

want to see their only son die," and, shortly before he was shot, asked his parents to "tell them

[the deputies] to stop screaming at me." (Brad Glenn Decl. (#71.) ¶ 9; Lucas Decl. (#72) ¶ 11;

Hope Glenn Decl. (#75) ¶ 18.) To Deputy Mataski, Lukus appeared "highly agitated and

irrational," and Deputy Mataski was concerned Lukus "would either charge [him] or attempt to

flee into the house where there were family members." (Mataski Decl. (#47) ¶¶ 12-13.) Both

Deputy Gerba and Deputy Mataski knew that the front door of the house could not be secured

because Lukus had kicked it in, and they were not aware of any other entrances or exits to the

home. (Gerba Decl. (#48) ¶¶ 16, 22; Mataski Decl. (#47) ¶¶ 13, 27.)

      At the time the deputies arrived, Lukus's friends Tony Morales and David Lucas had

been talking to Lukus, trying to calm him down and persuade him to drop the knife. (Lucas Decl.

(#72) ¶¶ 4-5.) The deputies ordered Mr. Morales and Mr. Lucas to move behind them. (Brad

Glenn (#71) ¶ 7.) The deputies ordered Hope and Brad Glenn to stay inside the house and close

the door. (Brad Glenn Decl. (#71) ¶ 7.) Brad Glenn asserts that it would have been possible for

the deputies to move him, his wife, and Lukus's grandmother outside the house to a position

behind the deputies, where these bystanders would have been safely out of Lukus's reach. (Brad

Glenn Decl. (#71) ¶ 7.) Hope Glenn asserts that the deputies could have positioned themselves

between Lukus and the front door of the home, where Hope and Brad Glenn stood. (Hope Glenn Decl. (#75) ¶ 13.)

Officer Andrew Pastore, a police officer for the City of Tigard, arrived approximately three minutes after Deputy Gerba and Deputy Mateski. At the time he arrived, Officer Pastore had read on his mobile dispatch terminal that Washington County Sheriff's Deputies had responded to a "disturbance/fight with weapons"; the dispatch center "felt the call presented significant officer safety concerns," and "the call involved a person armed with a knife who was breaking windows and threatening to kill himself." (Pastore Decl. (#49) ¶ 4.) Radio transmissions for the dispatch center suggested to Officer Pastore "that the suspect was more violent and threatening, than suicidal." (*Id.* at ¶ 5.)

Officer Pastore was equipped with a bean bag gun. A bean bag gun fires lead pellets contained in a cloth sack. (Gerba Decl. (#48) ¶ 25; Pastore Decl. (#49) ¶ 6.) The weapon is intended to induce compliance by causing sudden, debilitating, localized pain, similar to a hard punch or baton strike. (Pastore Decl. (#49) ¶ 6.) Unlike a hard punch or kick, however, an officer can use the gun while still maintaining "a relatively safe distance" from a suspect. (*Id.*) Although bean bag guns are not designed to cause serious injury or death, a bean bag gun is considered a "less-lethal" weapon, as opposed to a non-lethal weapon, because the bean bags can cause serious injury or death if one of them hits a person's head. (*Id.*) Unbeknownst to the deputies, Officer Pastore was also carrying a taser. Neither of the deputies were carrying tasers. (*See* Mateski Decl. (#47) ¶¶ 8-9, 22.)

Almost immediately after his arrival, Deputy Mateski told Officer Pastore to "bean bag" Lukus Glenn. In rapid succession, Officer Pastore told Lukus, "I have the bean bag," "drop the knife or I will shoot," and then "bean bag, bean bag." (Cox Decl. (#74) Ex. 19 at 101:11-14;

Mateski Decl. (#47) ¶ 24; Pl.'s Resp. to Def. Washington County's CSMF (#69) 21-22.) Several

rounds hit Lukus's left arm, torso, and hip. (Wagner Decl. (#45) Ex. 3 at 2.) Lukus appeared

surprised, confused, and possibly in pain, but he did not drop the knife or otherwise indicate that

he intended to comply with the officers commands. (Mataski Decl. (#47) ¶ 24; Pl.'s Resp. to Def.

Washington County's CSMF (#69) 26-27.) His reaction surprised the officers, who expected the

intense pain of the bean bag guns to knock the wind out of Lukus and encourage him to drop the

knife. (*See* Pastore Decl. (#49) ¶¶ 6, 16.) Some time between the fourth and sixth beanbag

rounds, Lukus began moving in the direction of house. (Brad Glenn Decl. (#71) ¶ 11; Lucas

Decl. (#72) ¶ 13; Morales Decl. (#73) ¶ 12.) After one or two steps (Brad Glenn Decl. (#71) ¶

11; Lucas Decl. (#72) ¶ 13; Morales Decl. (#73) ¶ 12), the deputies fired eleven rounds at Lukus,

eight of which hit him, and he died at the scene (Gerba Decl. (#48) ¶¶ 27, 29; Mataski Decl.

(#47) ¶¶ 28, 30).

## DISCUSSION

In their motions for summary judgment, Officer Pastore, Deputy Mateski, and Deputy

Gerba assert they are entitled to qualified immunity. In evaluating qualified immunity, courts

consider whether "the facts alleged show the officer's conduct violated a constitutional right" and

whether the constitutional right was "clearly established" such that "it would be clear to a

reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*,

533 U.S. 194, 201-02 (2001), *overruled on other grounds by Pearson v. Callahan*, ___ U.S. ___,

129 S. Ct. 808 (2009). Because the undisputed facts show that Lukus Glenn was armed with a

deadly weapon and posed an immediate threat to himself, officers, and nearby bystanders when

the officers used less-lethal, and then, lethal, force, I find that the officers' use of force did not

violate Lukus Glenn's Fourth Amendment rights.

To determine whether conduct is reasonable under the Fourth amendment, a court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation omitted). An officer's use of force must be "'objectively reasonable' in light of the facts and circumstances confronting [him]." *Id.* at 397. Application of this standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

The factors listed in *Graham* are not exclusive, and other courts have considered additional factors such as whether a warning was given, *Deorle v. Rutherford*, 272 F.3d 1272, 1283-84 (9th Cir. 2001), "the availability of alternative methods of capturing or subduing a suspect," *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (en banc), and whether the individual is mentally ill or emotionally disturbed, as opposed to an armed and dangerous criminal. *Deorle*, 272 F.3d at 1282-83. The Ninth Circuit has cautioned that the court should examine the totality of the circumstances and consider "whatever specific factors may be appropriate in a particular case." *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994). At a minimum, the court's consideration of these factors must account "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

## I.    Less-Lethal Force

Although Lukus was killed by gunshots, rather than a bean bag round, the officers'

decision to employ the bean bag gun is critical to resolution of this case. The officers used deadly force because Lukus began moving toward his parents' front door. Glenn only turned toward his parents' door after he was shot with bean bags; until that moment, he had not moved from his position by the garage. Because the use of less-lethal force precipitated the use of deadly force, the reasonableness of deadly force depends in large part on whether it was reasonable to fire a bean bag gun in the first place. *See Espinosa v. City and County of San Francisco*, 598 F.3d 528, 548 (9th Cir. 2010) ("[E]ven though the officers reasonably fired back in self-defense, they could still be held liable for using excessive force because their reckless and unconstitutional provocation created the need to use force."); *Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002) ("[W]here an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation, he may be held liable for his otherwise defensive use of deadly force.").

A.    *Immediate Threat*

Even though a bean bag gun is not intended to be lethal, it is a significant level of force that must be justified by "a strong government interest [that] compels the employment of such force." *Deorle*, 272 F.3d at 1280; *see also Bryan v. McPherson*, 590 F.3d 767, 774 (9th Cir. 2009) (applying the *Graham* balancing test to an officer's use of a taser). Plaintiff argues that it was unreasonable to shoot Lukus Glenn with a bean bag gun because he posed no immediate threat to others, and that this unreasonableness would have been apparent to the officers based on existing case law. Based on undisputed facts and existing law, however, I find the officers reasonably believed that Lukus posed an immediate threat justifying the use of less-lethal force.

To prove that the officers acted unconstitutionally, plaintiff relies primarily on two Ninth Circuit cases, *Smith v. City of Hemet*, 394 F.3d 689, and *Deorle v. Rutherford*, 272 F.3d 1272,

which both found a genuine issue of material fact regarding whether police officers' use of force was reasonable. I disagree that these cases, both of which involved a suspect who was not armed with a deadly weapon and posed no immediate threat to anyone, show that the officers' conduct in this case violated the Fourth Amendment.[6]

As plaintiff and defendants demonstrated in their briefing, it is possible to find both distinctions and similarities between this case and the facts of *Smith* and *Deorle*, not to mention the facts of most other cases evaluating whether an officer's use of force was reasonable. And there are certainly some factors that cut against the reasonableness of the officers' use of force: Lukus Glenn's apparent emotional distress, his lack of criminal history, the officers' allegedly "angry, frenzied, amped, and jumpy" demeanor (Hope Glenn Decl. (#75) ¶ 14), and the short time between the officers' arrival and their use of force,.

But within this body of law, certain factors matter more than others, and the factor that matters most is whether the suspect posed an immediate threat to officers or bystanders. *Bryan*, 590 F.3d at 775; *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994); *see also Graham*, 490 U.S. at 396. And in evaluating whether a suspect posed an immediate threat, the law places substantial weight on a single, critical fact—whether a suspect is armed with a weapon. *See Smith*, 394 F.3d at 702 ("There is no indication in the record that after Smith removed his hands from his pockets there was any reason to believe that he possessed any weapon or posed any immediate threat to the safety of the officers or others."); *Deorle*, 272 F.3d at 1281 n.18 ("Deorle was wearing no shirt or shoes, only a pair of cut-off jeans shorts. There was nowhere for him to

---

[6] Plaintiff and defendants have also cited several unpublished Ninth Circuit dispositions. Although I have considered the reasoning of these cases in reaching a decision, I remind the parties that the Ninth Circuit's unpublished dispositions are not precedent. *See* 9th Cir. R. 36-3(a).

secrete any weapons."). Even when a suspect exhibits obvious signs of mental illness or emotional distress, the Ninth Circuit has been careful to distinguish the level of force that may be justifiable when such a person is "neither a threat to himself nor to anyone else," *Bryan*, 590 F.3d at 778, from situations in which a mentally ill person is armed with a deadly weapon and actively threatening himself and others. *See Blanford v. Sacramento County*, 406 F.3d 1110, 1117-18 (9th Cir. 2005) (recognizing that it is not objectively unreasonable for officers to prioritize securing a deadly weapon, even when an individual appears mentally disturbed); *see also Deorle*, 272 F.3d at 1285 ("Every police officer should know that it is objectively unreasonable to shoot—even with a lead shot wrapped in a case cloth—an <u>unarmed</u> man who: has committed no serious offense, is mentally or emotionally disturbed . . . , and presents no objectively reasonable threat to the safety of the officer or other individuals.") (emphasis added).

With this framework in mind, I consider whether Lukus Glenn presented an immediate threat to himself and others such that firing a bean bag gun was within the realm of force that the Constitution deems reasonable to combat the threat.

### 1.    Threat to Himself

For purposes of summary judgment, I accept as true the factual assertions that, at the time the officers arrived, Lukus "was not in any physical altercation with anyone. He was not threatening [others] with the knife. No one was trying to get away from [him]." (Hope Glenn Decl. (#75) ¶ 11; Brad Glenn Decl. (#71) ¶ 4; Tony Morales (#73) ¶ 4; Lucas Decl. (#72) ¶ 6.). I cannot, however, accept as true the statement that "Luke was not threatening <u>anyone</u> with the knife" (emphasis added), because, in each declaration, this statement is immediately followed by the observation, "Luke was holding the knife against his throat." (Hope Glenn Decl. (#75) ¶ 11-12; Brad Glenn Decl. (#71) ¶ 4; Morales Decl. (#73) ¶ 4; Lucas Decl. (#72) ¶ 6.) Since it is

undisputed that Lukus held the knife to his throat and frequently stated that he intended to kill himself, the witnesses obviously intend to convey that Lukus was not actively threatening anyone <u>other than himself</u>.

Apart from the immediate threat to others, which I consider below, the officers were justified in using less-than-lethal force to prevent suicide. "[T]he the state has a clear interest in preventing anyone, no matter what age, from taking his own life in a fit of desperation, depression, or loneliness or as a result of any other problem, physical or psychological, which can be significantly ameliorated." *Compassion in Dying v. Washington*, 79 F.3d 790, 820 (9th Cir. 1996) (en banc), *rev'd sub nom on other grounds by Washington v. Glucksberg*, 521 U.S. 702 (1997). This legitimate interest takes precedent over an individual's "right" to suicide, which is not a fundamental liberty interest protected by the Fourteenth Amendment. *Glucksberg*, 521 U.S. at 723, 728. Driven by the state's legitimate interest in preserving life, Oregon law—and the law of at least a dozen other states—allows "[a] person acting under a reasonable belief that another person is about to commit suicide or inflict serious physical self-injury [to] use physical force upon that person to the extent that the person reasonably believes it necessary to thwart the result." Or. Rev. Stat. § 161.205; *see also Compassion in Dying*, 79 F.3d at 820 n.83 (collecting state statutes); *Bryan*, 590 F.3d at 778 (noting that the government interest in deploying force to detain a mentally ill suspect is not as strong when the "individual is neither a threat <u>to himself</u> nor to anyone else") (emphasis added). In this case, the officers reasonably believed that less-lethal force was necessary to prevent Lukus Glenn from killing himself. Based on their training and experience, they believed that the bean bag gun would disarm him without causing him permanent injury. (*See* Pastore Decl. (#49) ¶¶ 6-7.) Their predictions were wrong, but their error was not constitutionally unreasonable. *See United States v. Twilley*, 222 F.3d 1092, 1096 n.1 (9th

Cir. 2000) (noting that an officer's actions may be justified by "[a] factual belief that is mistaken, but held reasonably and in good faith.").

### 2.    Threats to Others

The officers were also justified in using a bean bag gun in light of the threat Lukus Glenn posed to officers and bystanders. Lukus indisputably carried a deadly weapon,[7] which he actively wielded in plain view of the officers. That fact alone prevents *Smith* or *Deorle* from clearly establishing constitutional boundaries against the officers' conduct in this case. In contrast, when a suspect was armed with a deadly weapon, the Ninth Circuit upheld the officers' use of force as a matter of law—even when the suspect "had not committed a significant crime or threatened anyone" and no identifiable bystanders were present. *See Blanford*, 406 F.3d at 1115-19 (holding that it was reasonable for officers to use deadly force when a suspect was attempting to enter a house, failed to heed warnings or commands, and was armed with a sword that he refused to put down and "made him a threat to anyone in charging range"); *see also Long v. City and County of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007) (holding that an officer was entitled to qualified immunity for shooting an agitated suspect who carried a rifle); *Scott v. Henrich*, 39 F.3d 912, 914-15 (9th Cir. 1994) (affirming the district court's decision to grant summary judgment in favor of an officer who shot and killed an armed man whom the officer erroneously believed had fired a shot at him and his partner).

Apart from carrying a deadly weapon, it is also significant that Lukus Glenn refused to

---

[7] In her 9-1-1 call, Hope Glenn referred to Lukus's knife as a "pocket knife." This description, while technically correct, understates the physical characteristics of that weapon. Although the knife is a pocket knife, in that it can be folded in half and placed in a pocket, it measures over seven inches long with a three-inch blade and a gutting hook. (Pastore Decl. (#49) Ex. A.) There is no question that this knife was capable of causing serious injury or death, and that this capability would have been immediately apparent to the officers who responded to the 9-1-1 call.

drop the knife when the officers commanded him to do so. Although the suspect in *Deorle* brandished various weapons at the officers before he was shot, he dropped his weapon each time the officers ordered him to do so. 272 F.3d at 1276. This conduct led the Ninth Circuit to describe the suspect's behavior as "physically compliant" while noting that he "generally followed all the officers' instructions." *Id.* Unlike the suspect in *Deorle*, however, Lukus never dropped his knife, despite the officers' instructions and their repeated warnings that he would be shot if he did not comply. *See also Graham*, 490 U.S. at 396 (considering whether a suspect was "actively resisting arrest"); *Deorle*, 272 F.3d at 1283-84 (considering whether a warning was given). These factors—lack of compliance, active resistance, and receipt of warnings—all weigh against any constitutional prohibition of the officers' use of intermediate, less-lethal force.

Finally, even though Lukus Glenn was obviously emotionally disturbed, a factor to which the officers should have assigned greater weight, *see Bryan*, 590 F.3d at 778; *Deorle*, 272 F.3d at 1282-83, it was not clear to the officers that he was *only* emotionally disturbed. That is, even viewed through the prism of summary judgment, there is undisputed evidence that Lukus Glenn was dangerous in addition to undisputed evidence that he was emotionally disturbed. Although "the tactics to be employed against[] an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal," *Deorle*, 272 F.3d at 1282, the calculus is different when an officer is aware of information that suggests the suspect is *both* emotionally distraught *and* armed and dangerous. *See Bryan*, 590 F.3d at 778 (noting that the governmental interest in using force is diminished "in the usual case—where [a mentally ill] individual is neither a threat to himself nor to anyone else," but acknowledging that the Ninth Circuit has "refused to create two tracks of excessive force analysis, one for the mentally ill and

-14-

one for serious criminals.")

      In this case, the officers responded to a "domestic disturbance—*fight* with a weapon."

(WCCCA Dispatch Recording) (emphasis added). Based on that characterization of the 9-1-1

call, it was objectively reasonable for the officers to believe they were responding to a situation

in which the suspect had threatened or attacked a family member with a knife. This interpretation

is supported by other parts of the dispatch recording, in which Deputy Mateski can be heard

asking whether "the complainants" can leave the house (WCCCA Dispatch Recording; Mateski

Decl. (#47) ¶ 12), and hears that the house could not be secured because Lukus "busted through"

his parents' front door (WCCCA Dispatch Recording). Furthermore, although the exact content

of Hope Glenn's 9-1-1 call was not directly communicated to the officers, the officers did know

that the 9-1-1 dispatcher determined that the call presented significant officer safety concerns

(*See* Pastore Decl. (#49) ¶ 4).

      Perhaps more importantly, when the officers arrived at the scene, what they saw there did

not obviously belie the information communicated through dispatch. I accept that Lukus "was

not in any physical altercation with anyone. He was not threatening [others] with the knife [and]

[n]o one was trying to get away from [him]" (Hope Glenn Decl. (#75) ¶ 11)—*after* the officers

arrived.  But nothing the officers saw suggested that Lukus had not threatened anyone or fought

his parents with a knife *before* the officers arrived. The officers saw broken glass from where

Lukus Glenn had broken his parents' windows. (Pastore Decl. (#49) ¶ 14.) They saw Lukus

holding the knife to his throat, and saw blood on the hand holding the knife. (Mateski Decl.

(#47) ¶ 16.). They heard Lukus shout at them, "You kill me or I kill me." (9-1-1 Call; Brad

Glenn Decl. (#71) ¶ 9), and ask his parents if they wanted to see their only son die. (Brad

Glenn Decl. (#71) ¶ 9).

-15-

In sum, at the time Deputy Mataski instructed Officer Pastore to shoot Lukus with the bean bag gun, the officers collectively knew the following: (1) the officers were responding to a "domestic disturbance—a fight with a weapon"; (2) the suspect had a knife; (3) the suspect's parent felt compelled to call 9-1-1 to seek the officers' help; (4) based on the information from the 9-1-1 caller, the 9-1-1 dispatcher determined that the call presented significant officer safety concerns; (5) the suspect was heavily intoxicated and suicidal; (6) he held the knife to his throat and his hand was bleeding; (7) he refused to drop the knife, despite repeated commands and warnings from the officers; (8) he threatened either to kill himself or commit some dangerous act that would compel the officers to shoot him ("You kill me or I kill me"); (9) he had smashed several windows with a shovel; and (10) he had kicked in his parent's front door, such that the door could not be secured.

Furthermore, shortly before the officers arrived, Lukus told his mother that he would "run at the cops with a knife" (Hope Glenn Decl. (#75) ¶ 22), and, in Hope Glenn's words, "was threatening to kill everybody." (9-1-1 Call). Hope Glenn also told the 9-1-1 operator that she called 9-1-1 because she "was so scared," and felt safe "unless he [Lukus] starts running in here." (*Id*.) Although I assume, for purposes of summary judgment, that these specific statements were not known to the officers at the time of the incident, this uncontroverted evidence demonstrates that the officers' safety concerns were not at odds with information provided to law enforcement.

In light of these facts, no officer could be expected to conclude that a suspect who holds a deadly weapon, stands in close proximity to several identifiable potential victims, and repeatedly fails to comply with officers' commands to drop his weapon is not an immediate threat under existing law. Viewed as a whole, the immediacy of the threat created a "strong governmental interest [that] compel[led] the employment of [less-lethal] force." *See Deorle*, 272 F.3d at 1280.

-16-

B.    *Tactical Decisions*

Plaintiff argues that the officers' conduct at the scene contributes to the excessive force used because the officers' tactics provoked the use of less-lethal, and then deadly, force. In support, she cites an expert who concluded "that the responding shooters and Officer Pastore escalated a static situation into an unnecessary and unavoidable shooting" based on a number of poor tactical decisions that showed a failure "to exercise a reasonable standard of care." (Van Blaricom Decl. (#104) Ex. 24 at ¶ 12.) Her argument appears to rely on the principle that, "[w]here an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation, [the officer] may be held liable for his otherwise defensive use of deadly force." *Billington*, 292 F.3d at 1189 (9th Cir. 2002). The officer's tactical decisions before firing the bean bag gun do not fall within the *Billington* rule for four important reasons.

First, a plaintiff cannot "avoid[] summary judgment by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless. Rather, the court must decide as a matter of law whether a reasonable officer could have believed that his conduct was justified."[8] *Billington*, 292 F.3d at 1189 (quotation omitted).

Second, the officers' tactical decisions, whether an exercise of best police practices or not, did not constitute an independent Fourth Amendment violation because the tactics did not amount to a "search" or "seizure" within the meaning of the Fourth Amendment.

Third, the officers cannot be said to have "provoked" a violent confrontation, thereby

---

[8]  *Billington* actually considered an opinion from the same expert witness that plaintiff offered in this case. *See* 292 F.3d at 1182.

creating a need for force that did not otherwise exist. Viewing the evidence in this case in the

light most favorable to plaintiff, a reasonable jury could find that the officers' presence escalated

the situation. But the violent confrontation, the "fight with a weapon," the breaking of windows

and his parent's front door, and the threats to kill himself and others began before the officers

arrived and were entirely unrelated to the officer's actions. Based on these facts, and the fact that

a knife was involved, the justification for the officers' use of some level of force existed before

they ever arrived at the scene.

Fourth, the evidence shows, at best, that the officers might have used better tactics to

control the situation and, for that reason, may have failed to exercise reasonable care as a matter

of tort law. But when the Fourth Amendment speaks of "reasonable" police conduct, that term

carries a different meaning than conduct we might commonly describe as "sensible," "practical,"

or what tort law would refer to as an exercise of ordinary or reasonable care. Instead, the Fourth

Amendment's reasonableness requirement is applied only in specific contexts—those in which a

government actor "searches" or "seizes" an individual—and evaluates only whether the intrusion

on an individual's Fourth Amendment privacy interest was justified in light of the government

interest. For this reason, "[a]n officer may fail to exercise 'reasonable care' as a matter of tort law

yet still be a constitutionally 'reasonable' officer. . . . [And] even if an officer negligently

*provokes* a violent response, that negligent act will not transform an otherwise reasonable

subsequent use of force into a Fourth Amendment violation." *Billington*, 292 F.3d at 1190

(emphasis in original).

Accordingly, when the Ninth Circuit has considered arguments that officers were not

justified in using force because they failed to use a different tactical approach, those arguments

have been uniformly rejected. *See Billington*, 292 F.3d at 1183, 1185, 1191 (reversing a district

court's decision to deny summary judgment to an officer where the denial was based on a genuine issue of material fact as to whether an officer's alleged tactical errors "recklessly created the situation in which force would have to be used"); *Henrich*, 39 F.3d at 915 (rejecting a plaintiff's argument that officers' conduct violated the Fourth Amendment because the officers "shouldn't have tried to seize [the suspect] immediately, but should instead have developed a tactical plan to deal with the situation, sealed the possible escape avenues, called for assistance, and tried to get [the suspect] to surrender."). Other circuits have reached the same conclusion on similar facts. *See Medina v. Cram*, 252 F.3d 1124, 1132-33 (10th Cir. 2001) (holding that an officer's decision to use force was not unreasonable on account of alleged tactical errors, even if the errors "contributed to the need for force," because tactical errors like failing to take cover or gradually escalating the use of force did not "rise to the level of reckless or deliberate conduct.").

As these decisions illustrate, courts are ill-equipped to decide whether an officer made the "best" tactical decisions in the field, which necessarily requires the courts to evaluate whether alternative tactics were even feasible and whether those tactics would have led to a different or "better" result.  Consider, for example, just one tactical error relied on by plaintiff: the failure to remove Brad and Hope Glenn from the house to a more secure location, thereby eliminating the potential threat to others. But this alternative raises at least as many tactical questions as it answers. How much distance between Lukus Glenn and his parents is considered "safe"? Lukus Glenn appeared to be agitated by his parents, who had called 9-1-1—would moving his parents have provoked him to violence? Were Brad and Hope Glenn in greater danger if they moved outside? Were they in greater danger if they stayed in the house? Would the officers have been placed in an unsafe tactical position if they were positioned between Lukus and his parents? What effect would the distraction have had on the officers' efforts to get

Lukus to drop his knife?

Therefore, although I have considered the officer's tactical decisions as part of the totality of the circumstances in this case, I find that these decisions do not fall within the range of provocational conduct for which the law converts an otherwise reasonable use of force into an unreasonable one.

    **C.**    ***Whether a Taser Should Have Been Used***

Plaintiff argues that it was unreasonable for the officers to use a bean bag gun instead of a taser both because a taser would was a less intrusive alternative to the bean bag gun and because a taser would have led to a more desirable outcome by obviating the need for lethal force. For the reasons set forth below, I determine that the officer's decision to use a bean bag gun instead of a taser was not constitutionally unreasonable.

Defendants offered several reasons supporting their decision to use a bean bag gun rather than a taser, including: (1) a taser is not effective unless both probes hit the suspect and lodge a certain distance apart, which was more difficult to achieve given the distance between Officer Pastore and Lukus Glenn; (2) Lukus was turned sideways to Officer Pastore, which presented a smaller taser target; (3) the angle of the shot would have required Officer Pastore to aim the taser at Lukus's head; and (4) there was a danger that incontrollable muscle spasms would cause Lukus to fall on the knife that he was holding to his neck at the time. (Pastore Decl. (#49) ¶¶ 6-11, 23). Plaintiff responded with an expert who opined: "Had Officer Pastore used his reliable TASER to immobilize the decedent, instead of pelting him with multiple impact projectiles from a shotgun, this incident would have more probably than not been resolved without lethal force." (Van Blaricom Decl. (#104) Ex. 24 at ¶13(f).)

Ultimately, however, this case does not depend on whether Officer Pastore should or should not have used a taser. An expert's opinion that an officer used "reckless" tactics or should have used other methods of subduing a suspect is "insufficient to raise a genuine issue of fact regarding the reasonability of [an officer's] use of force." *Reynolds v. County of San Diego*, 84 F.3d 1162, 1170 (9th Cir. 1996), *overruled on other grounds by Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1000 (9th Cir. 1997). Fourth Amendment analysis does not ask whether different tactics or another use of force would have been "more" reasonable. *See Reynolds*, 84 F.3d at 1170. Instead, *Graham* and its progeny consider whether the totality of the circumstances justified the force that was *actually* used. *See, e.g.*, *Graham*, 490 U.S. at 397 (balancing "the nature and quality of the intrusion . . . against the countervailing governmental interests at stake") (quotation omitted); *Liston v. County of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997) ("The force which was applied must be balanced against the need for that force.") (quoting *Alexander v. City and County of San Francisco*, 29 F.3d 1355, 1367 (9th Cir. 1994) (alterations omitted)).

### 1.    Availability of Less Intrusive Alternatives

In asserting that the officers should have worked their way up the police department's use-of-force continuum before applying less-lethal force, plaintiff's argument seeks to make using lesser force into a necessary predicate to using greater levels of force. The law in this area explicitly contradicts plaintiff's position. Officers "need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable." *Henrich*, 39 F.3d at 915. Although a court may consider whether officers might have used a lesser amount of force, that consideration is but one of several factors that courts use to analyze the overall reasonableness of an officer's actions. *See*

*Smith*, 394 F.3d at 701 ("In some cases . . . the availability of alternative methods of capturing or subduing a suspect <u>may</u> be a factor to consider.") (emphasis added). However, use of non-lethal force is not a necessary predicate to the application of less-lethal force, and the availability of lesser force does not, in and of itself, make otherwise reasonable conduct unreasonable.

Although I agree that there are cases in which the application of a certain level of force may be unreasonable because a lesser level of force was available, I disagree that this is such a case. In order for the availability of lesser force to diminish the reasonableness of force that is otherwise justified by the totality of the circumstances, there must be significant difference in the quantum of force applied. For example, if evidence suggests that tackling a suspect would have neutralized the immediacy of the threat, that factor tends to suggest that the use of a bean bag gun was unreasonable because the quantum of force applied by tackling is significantly less than the quantum of force applied by a bean bag gun. Neither the evidence in the record nor existing case law suggests a material difference between the quantum of force applied by a taser in dart mode[9] and that applied by a bean bag gun, however. Instead, existing law categorizes both weapons as "medium," "intermediate," or "less than lethal," levels of force. *See Mattos v. Agarano*, 590 F.3d 1082 (9th Cir. 2010) (per curiam) (describing the amount of force employed by a taser as "more than a non-serious or trivial use of force but less than deadly force" and noting "[u]nfortunately, there is a lot of room between these end points"); *Bryan*, 590 F.3d at 774 (characterizing a taser in dart mode as "an intermediate or medium, though not insignificant,

---

[9] A taser can be applied in two modes, dart mode and stun-drive mode. *See Brooks v. City of Seattle*, 599 F.3d 1018, 1026 (9th Cir. 2010). Because the officers had to maintain a safe distance from Lukus and his knife, the officers would not have been able to use a taser in stun mode. (*See* Pastore Decl. (#49) ¶¶ 6-11.) Therefore, plaintiff's observation that a bean bag gun applies a "much greater" level of force than does a taser in stun mode is probably true but ultimately immaterial. (*See* Pl.'s Supplemental Mem. (#99) 7.)

quantum of force"); *Deorle*, 272 F.3d at 1279-80 (characterizing a bean bag round as "force [that] is much greater than that applied through the use of pepper spray . . . or a painful compliance hold . . . and more likely to cause a life-threatening injury than most dog bites."). The Ninth Circuit has also described these weapons in similar terms, noting that a taser shot is a "painful and frightening blow" that causes intense pain "immobilization, disorientation, loss of balance, and weakness" and may result in "serious injuries," *Bryan*, 590 F.3d at 774, and a bean bag round is "long-range impact weapon" that is "less than deadly" but "which has the capability of causing serious injury." *Deorle*, 272 F.3d at 1279-80. Even plaintiff's own expert notes that "the electric shock that results from [the application of a taser] is very painful to the recipient." (*See* Van Blaricom Decl. (#104) Ex. 24 at 3.) Therefore, I do not find that there is a sufficient difference in the quantum of force applied by a taser, as opposed to a bean bag gun, such that the availability of a taser made it unreasonable for the officers to use a bean bag gun.

## 2.    Producing a More Desirable Result

Plaintiff also argues that a reasonable jury could find that a taser would have produced a more desirable result by immobilizing Lukus Glenn and making him incapable of moving in the way that provoked the officers to shoot him. Because Fourth Amendment analysis evaluates the justification for the force that was actually used, it is important to note that a reasonable jury could agree that a taser would have produced a better result but still find that the existing circumstances justified the use of a bean bag gun. But beyond that basic principle, I disagree that a jury could find, on this record, that the benefits of using a taser outweighed the danger of using a bean bag gun such that using a bean bag gun was unreasonable. In retrospect, a taser's ability to immobilize Lukus Glenn may have produced a more desirable outcome in this case because, if the taser were deployed successfully, Lukus would not have been physically capable of making

the movements that compelled the officers to shoot him. But "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Therefore, a jury would not be permitted compare the actual consequences of the bean bag gun with the ideal outcome produced by a taser, as plaintiff and plaintiff's expert have done in this case. Instead, a jury must compare the expected outcome of using a taser to the expected outcome of using a bean bag gun, in the way those expected outcomes were known to the officers at the time they fired the bean bag gun. Both the taser and the bean bag gun were expected to end Lukus's resistance or compel him to drop his knife, and both weapons were expected to produce this outcome without causing him permanent injury. *See Deorle*, 272 F.3d at 1280 (noting that a bean bag gun is "designed to knock down a target, rendering the individual incapable of resistance, without (in the normal course of deployment) resulting in death"). On this record, no jury could find that the discrepancy in expected outcomes was so significant that it was constitutionally unreasonable for the officers to use a bean bag gun rather than the taser.

In light of the totality of the circumstances in this case, particularly the undisputed facts establishing that the officers reasonably believed Lukus Glenn posed an immediate threat, the law did not require the officers to try to subdue Lukus using a taser rather than a bean bag gun. The officers' use of less-lethal force did not exceed the boundaries of the conduct the Fourth Amendment deems reasonable.

## II.    Lethal Force

Although deadly force is a more serious intrusion than less-lethal force, and therefore must be justified by a greater government interest, the touchstone question is still whether the officers acted reasonably. *See Graham*, 490 U.S. at 396; *see also Scott v. Harris*, 550 U.S. 372,

383 (2007) ("Whether or not [the officer's] actions constituted application of 'deadly force,' all that matters is whether [the officer's] actions were reasonable."). Therefore, I consider whether deadly force falls within the continuum of force that the Constitution allows officers to use to meet the type of threat that Lukus Glenn posed to officers and bystanders.

At oral argument and in his response to defendants' motion, plaintiff's counsel suggested that the number of shots fired at Lukus, or the manner in which they were fired, could itself be constitutionally unreasonable. He suggested that, even if the officers were justified in using lethal force, they should have applied that force in a "less-lethal" manner that may have given Lukus a chance to survive the use of force. I disagree that the Fourth Amendment includes such a limitation. Once the Constitution permits an officer to use deadly force—that is, force that "creates a substantial risk of causing death or serious bodily injury," *City of Hemet*, 394 F.3d at 705-06—the officer is not required to apply that force in a less lethal manner. *Espinosa v. City & County of San Francisco*, a case cited by plaintiff, does not suggest otherwise. In that case, there was a question regarding whether it was reasonable to use of deadly force on a suspect who "had not been accused of any crime[,] . . . was not a treat to the public[,] had not brandished a weapon, spoken of a weapon, or threatened to use a weapon [and], in fact, did not have a weapon." 598 F.3d at 538. Although the court mentions the number of shots fired (over twice as many shots as were fired in this case), nothing in *Espinosa* suggests that the use of deadly force was reasonable but for the number of shots fired or the manner in which they were fired. Therefore, I consider only whether, under the totality of the circumstances, the Fourth Amendment prohibited the officers from using force that creates a substantial risk of death or serious bodily injury.

As I have done throughout this opinion, I view the evidence in the light most favorable to plaintiff and search for disputes of material fact. Plaintiff and defendants dispute whether Lukus

"ran" toward the house, how many steps he took, and what his motivation might have been for

doing so. Plaintiff also argues that there is a dispute of material fact regarding whether Lukus

Glenn was headed toward an alcove behind the house or whether he was headed toward his

parents' front door. (*See, e.g.*,  Hope Glenn Decl. (#75) ¶ 20 ("While being struck by beanbag

rounds, Luke put his hands down, grabbed his pants and began to move away from the beanbag

fire toward the alcove between the house and garage.").) And if the difference between moving

toward the alcove and moving toward the front door was suggested by the physical direction of

Lukus's movements, then I would agree that this discrepancy could create a dispute of material

fact as to whether the officers reasonably believed that Lukus was heading for his parents' front

door rather than the alcove. But the undisputed evidence shows that the witnesses' distinction

between the alcove and the front door is an interpretation of Lukus's underlying intent, rather

than a description of the direction he was traveling. Plaintiff's witnesses agree that Lukus "was

standing by the corner of the garage" and remained there until the officers fired the bean bag gun

at him. (Hope Glenn Decl. (#75) ¶ 12; Morales Decl. (#73) ¶ 4; Lucas Decl. (#72); Brad Glenn

(#71) ¶ 4.) Photographs and maps of the Glenn residence, some of which are plaintiff's own

exhibits and none of which are contested, show that Lukus could not have headed in the

direction of the alcove without also heading in the direction of his parents' front door. (Cox Decl.

(#74) Ex. 4 at 31; *see also* Pastore Decl. (#49) Ex. C.) The officers were not required to wait and

see which direction he ultimately was going before they fired.

       Whether Lukus intended to take cover in the alcove, attack his parents with a knife, or

simply force the officers to shoot him is unknown. These are disputes of fact, but not disputes of

material fact. For purposes of defendants' motion for summary judgment, I ask only whether, on

undisputed facts, it was objectively reasonable for the officers to believe that Lukus was moving

toward his parents' front door such that he increased the immediacy of his threat to them and created a justification for the officers' use of lethal force. And the undisputed evidence shows that Lukus moved in the direction of his parents' front door, knife in hand, after being hit with several bean bag rounds.

At the moment the officers fired their guns at Lukus, the officers had the same knowledge that induced them to use less-lethal force, plus the additional knowledge that Lukus did not drop the knife or otherwise comply with the officers' commands after being hit with several bean bag rounds. The officers knew that Lukus's parents, who had called 9-1-1 to obtain the officers' help, were standing approximately fifteen feet away and could not lock their door to keep Lukus outside of the house. (*See* Pastore Decl. (#49) Ex. C.)

Once Lukus turned and moved toward his parent's front door, it was constitutionally reasonable for the officers to use deadly force in light of the information known to them at the time. *See Blanford*, 406 F.3d at 1118-19 (holding that it was objectively reasonable for an officer to employ deadly force when a suspect "was armed with a dangerous weapon, was told to stop and drop it, was warned that he would be shot if he didn't comply, appeared to flaunt the deputies' commands . . . , refused to let go of the sword, and was intent upon trying to get inside a private residence . . . with the sword in hand"). This analysis does not change because Lukus's movement could be attributed to the officers' conduct in firing the bean bag gun. *See Billington*, 292 F.3d at 1190 ("[I]f a police officer's conduct provokes a violent response . . . but is objectively reasonable under the Fourth Amendment, the officer cannot be held liable for the consequences of that provocation regardless of the officer's subjective intent or motive."). That Lukus's movement could have been a function of his confusion and extreme intoxication, rather than a deadly motive, makes this case all the more tragic, but it does not make the officers'

response objectively unreasonable.

**III.    _Monell_ Liability**

Because the officers did not violate Lukus Glenn's constitutional rights, Washington County is not liable for the officer's conduct. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) (requiring proof of a policy or custom that deprived the plaintiff of his or her constitutional rights); *see also City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam).

**IV.    Wrongful Death Claim**

In light of my decision that the officers' two acts of force were constitutionally reasonable, defendants are entitled to summary judgment on plaintiff's wrongful death claim. Wrongful death claim is a statutory remedy that allows the personal representative of a decedent to recover "[w]hen the death of a person is caused by the wrongful act or omission or another." O.R.S § 30.020(1). For the reasons set forth above, the officers reasonably believed "the use of deadly physical force [was] necessary to defend the peace officer or another person from the use or threatened imminent use of deadly physical force," and were therefore legally justified in using deadly force. *See* O.R.S § 161.239(1)(c). Therefore, their actions were not "wrongful" as a matter of law.

**CONCLUSION**

There is much to lament about this case:  a young man's life cut short; a loving mother's cry for help transmogrified into a deadly encounter with the police; officers left with the haunting realization that they shot a man—almost a boy—in front of his family. If the question is, "is it possible that this scenario could have played out differently, so that Lukus Glenn came out alive?" then the answer is almost certainly yes. And despite the way litigation tends to harden

-28-

people's positions, it is to be hoped that the law enforcement agencies involved ponder the events of September 16, 2006, with the goal of a better outcome the next time they face a suicidal young man in the dark.

But whether this scenario could have played out differently is not the question. The Constitution does not set up federal courts as a sort of Super Commissioner, evaluating tactical decisions on the street from the quiet confines of the courtroom. Instead, the Constitution sets up general parameters for the use of deadly force. When the use of deadly force is challenged in court, two questions are asked: (1) Was the use of deadly force within the parameters established by the Constitution; and (2) were those parameters, as explained in relevant cases, clear enough on the facts the officers faced that they should be held to have understood that they were acting unconstitutionally.

In this case, the answer to the first question is yes; the use of deadly force was within the parameters set up by the Constitution. And as the analysis above makes clear, the answer to the second question is no; no case instructed these officers that they could not employ deadly force, relying on the undisputed facts they faced.

For the foregoing reasons, I GRANT Defendants' Motion for Summary Judgment (#38).

IT IS SO ORDERED.

DATED this _21st_ day of June, 2010.

> _/s/ Michael W. Mosman_____
> MICHAEL W. MOSMAN
> United States District Court