Lawrence K. Peterson, OSB #83006
LAWRENCE K. PETERSON LAW OFFICE
301 Lakeside Plaza
8 North State Street
Lake Oswego, OR 97034-3956
Telephone:    (503) 635-3546
Facsimile:    (503) 636-8512
E-mail:        larry@petersonlaw.info

Michael A. Cox, OSB # 93507
LAW OFFICE OF MICHAEL A. COX
7420 S.W. Bridgeport Road, Suite 101
Tigard, OR 97224
Telephone:    (503) 443-2100
Facsimile:    (503) 328-7996
E-mail:        mcox@mcoxlegal.com

David D. Park, OSB #80335
ELLIOTT & PARK
Abernethy House
0324 S.W. Abernethy Street
Portland, Oregon  97239-4356
Telephone:    (503) 227-1690
Facsimile:    (503) 274-8384
E-mail:  dave@elliott-park.com

        Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| HOPE GLENN, as the Personal Representative of the ESTATE OF LUKUS GLENN, | ) ) ) | Civil Case No. 3:08-CV-950 MO |
| Plaintiff, | ) ) ) | MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE "EXPERT" |
| v. | ) ) | TESTIMONY OF WILLIAM LEWINSKI |
| WASHINGTON COUNTY, et al, | ) ) | |
| Defendants. | ) ) ) | |

Page 1 -  MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE
        "EXPERT" TESTIMONY OF WILLIAM LEWINSKI

**Introduction**

Defense "expert" William Lewinski, Ph.D., should not be permitted to testify – his testimony should be excluded in its entirety – because he lacks the requisite qualifications to testify as an expert in mental chronometry, memory and attention, the research upon which his testimony is founded is of very poor quality and is invalid and unreliable, he does not reliably apply the scientific methods and principles about which he proposes to testify to the facts of this case and his testimony will not be of assistance to the jury.

**Subject Matter of Proffered Expert Testimony**

There are two subject areas of Dr. Lewinski's proposed expert testimony: (1) attention and memory, in which Dr. Lewinski relies on "research" he has conducted for his opinions in the "Report" section of his expert witness statement that discrepancies between defendant Gerba's and Officer Pastore's descriptions of the content and sequencing of the event and their own prior statements, physical evidence or other witnesses' recollections is best explained by the "behavioral science" of human attention and memory under stress rather than their lack of veracity (Lewinski Report, pp. 6-7, ¶¶ 1-9) and that defendant Gerba's "memory" about where he was standing in relation to the wheelbarrow "would generally have a very high degree of factual accuracy" compared to his estimate of the distance between himself and Mr. Glenn (Lewinski Report, p. 10, ¶ 1)[1], and (2) mental chronometry (measurement of the duration of time between

---

[1]There are discrepancies in Deputy Gerba's "memory" of his location at the time of the shooting, as well.  For example, (a) could feel "the front part of the wheelbarrow . . . just above my knee", Gerba depo. 20-21; (b) near left rear corner of motor home, Gerba statement during walk through at scene as reported by M. Anderson, Criminalist, in her Special Report, p. 5; (c) "by the wheelbarrow", Tr. of Gerba's recorded statement, p. 24.

the onset of perceptual processing and a final motor response) in which Dr. Lewinski, again,

relies on "research" he has conducted to measure and compare the time it takes an officer to

respond to certain stimuli (*e.g.*, perceive a movement by a subject as a lethal threat and pull the

trigger) to the time within which the subject/threat can complete relevant physical movements

(*e.g.*, cover a certain number of feet of distance or change direction) for his opinions in the

"Action/Reaction" section of his expert witness statement that (a) the officers were in danger due

to their physical  proximity to Lukus Glenn (Lewinski Report, p. 8, ¶ 1); (b) that Lukus Glenn

"could have and apparently did shift his direction of travel away from his parent's location

toward the grandmother's location" between the time the officers  made the decision to shoot and

when they pulled the trigger (Lewinski Report, pp. 8-9, ¶¶ 2-4); and (c) that it would have taken

the officers longer to perceive that Lukus was no longer a threat and stop shooting than it took

them to perceive him as a threat and commence shooting (Lewinski Report, p. 9, ¶ 5).

### Standards for Admissibility of Expert Testimony

Rule 702 of the Federal Rules of Evidence controls the admission of expert testimony.  It

provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact
> to understand the evidence or to determine a fact in issue, a witness qualified as an
> expert by knowledge, skill, experience, training, or education, may testify thereto
> in the form of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods reliably to the
> facts of the case.

Rule 702 requires the trial judge to perform a critical "gatekeeping" function concerning

the admissibility of all forms of expert testimony.  *Kumho Tire Company v. Carmichael*, 526 US

137, 119 SCt 1167, 143 L Ed 2d 238 (1999). "[T]he objective of that requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." 526 U.S. at 152, 119 S.Ct. at 1176. The district court's role is especially significant since the expert's opinion "can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 US 579, 595, 113 SCt. 2786, 125 L.Ed.2d 469 (1993) (*Daubert I*) (quoting Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended,* 138 FRD 631, 632 (1991) ("Weinstein")).

The court engages in a two-pronged analysis to determine the admissibility of expert testimony. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F3d 1311, 1315 (9th Cir), *cert. denied*, 516 US 869 (1995) (*Daubert II*). First, the court determines the reliability of the expert's testimony by examining the expert's qualifications and determining whether the expert's testimony reflects good science. To be good science, the testimony must reflect scientific knowledge and the expert's findings must be derived by the scientific method. *Id.* The court's task "is to analyze not what the experts say, but what basis they have for saying it." *Id*. at 1316. In conducting its analysis, the court determines "whether the analysis undergirding the experts' testimony falls within the range of accepted standards governing how scientists conduct their research and reach their conclusions." *Id*. at 1317.

Second, the court determines whether the proffered testimony would assist the trier of fact to determine the facts at issue in the case. *Id*. at 1315. The court must determine that the

Page 4 -   MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE
               "EXPERT" TESTIMONY OF WILLIAM LEWINSKI

proposed expert testimony "fits" or is "relevant to the task at hand" and "logically advances a material aspect of the proposing party's case." *Hall v. Baxter Healthcare Corp*., 947 FSupp 1387, 1386 (D Or 1996). The "helpfulness" of the evidence is not limited to an examination of its relevance. If the probative value of the evidence is substantially outweighed by its potential for confusion of issues, misleading the jury or wasting time, it will excluded on Rule 403 grounds. For the reasons that follow, Dr. Lewinski's testimony fails both prongs of the analysis.

The proponent of the expert testimony bears the burden of proof as to its admissibility. *Hall v. Baxter Healthcare Corp*, 947 FSupp 1387, 1395 (D Or 1996); *Lust v. Merrell Dow Pharmaceuticals, Inc.,* 89 F3d 594, 598 (9th Cir.1996) ("[i]t is the proponent of the expert who has the burden of proving admissibility). In this case, the defendants, as the proponents of the evidence, have the burden of proving the admissibility of William Lewinski's testimony by a preponderance of the evidence. *Daubert,* 509 US at 592, n. 10. Federal Rule of Evidence 104(a) controls the procedure by which the court determines the admissibility of the expert's opinion. *Id*. Further, in determining admissibility "the court is not bound by evidence rules, except those on privilege". FRE 104(a).

### Plaintiff's Evidence and Argument in Support of Exclusion of Testimony

1.  <u>William Lewinski's testimony must be excluded because he lacks the requisite qualifications to testify as an expert, the "research" upon which he bases his testimony is not the product of scientifically reliable principles or methods and he has not reliably applied the scientific methods and principles about which he proposes to testify to the facts of this case.</u>

In William Lewinski's November 4, 2009 expert witness report ("Lewinski Report"), a copy of which is attached as Exhibit "A" to the Declaration of David Park in Support of Motion

Page 5 -   MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE
          "EXPERT" TESTIMONY OF WILLIAM LEWINSKI

to Exclude Expert Testimony of William Lewinski ("Park Decl." or "Park Declaration"), Dr. Lewinski represents that he is "conducting the leading research into human performance in lethal force encounters" and that his research focus "is on subject and officer movement in lethal force encounters as well as action/reaction parameters (including judgment time), perception and memory".  Lewinski Report, p. 3 at ¶ 2.

The following facts appear from Dr. Lewinski's "full profile" dated October 2009, provided by the defense as part of Dr. Lewinski's Rule 26 expert witness disclosures and attached as Exhibit "B" to the Park Declaration:  Dr. Lewinski has a Ph.D in "Police Psychology" which he obtained from Union Institute and University, Cincinnati, Ohio in 1988.  Dr. Lewinski does not hold licenses or certifications to practice any scientific profession from any state in any field.[2]  Dr. Lewinski is not a member of any professional societies.  Dr. Lewinski has not been the recipient of any research grants.

Dr. Lewinski's doctorate degree program was "a non-traditional program . . . delivered in a non-traditional fashion."[3]  A traditional doctorate program requires five years of study.  The Union Institute program required only three.  Union Institute is not accredited by the American Psychological Association (APA).

Plaintiff retained Dr. Lisa Fournier, Ph.D., an associate professor and the director of experimental training in the psychology department of Washington State University, Pullman, to

---

[2]In the absence of a license, it is unlawful to represent oneself as a psychologist under Oregon law.  ORS 675.020(1).

[3]Exhibit C to Park Decl., excerpts from Lewinski depo. taken in *Wilkins v. City of Oakland and County of San Francisco* on March 2, 2006 ("Wilkins Transcript") at p 105.

Page 6 -  MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE
            "EXPERT" TESTIMONY OF WILLIAM LEWINSKI

review Dr. Lewinski's expert witness report, assess his qualifications as an expert in the relevant fields of science, examine the research studies upon which Dr. Lewinski's testimony is based, assess whether Dr. Lewinski's research is scientifically reliable and whether Dr. Lewinski reliably applied scientific principles and methods in arriving at his opinions relevant to this case. In addition, Dr. Fournier addresses whether and to what extent William Lewinski's "research" meets the "peer review" standard described in *Daubert II* ("publication in a generally-recognized scientific journal that conditions publication on a bona fide process of peer review.") 43 F3d at 1318, n.6.

Dr. Fournier received her Ph.D. in Experimental Psychology from the University of Illinois at Urbana-Champaign in 1993 and completed a two-year post doctorate program in cognitive psychophysiology from the same university. Dr. Fournier focuses her research on attention, memory, perception and action – the same areas in which Dr. Lewinski proposes to testify as an expert. Dr. Fournier teaches research methods, which covers research design, hypothesis testing, measurement, internal and external validity/reliability and ethics, among other undergraduate and graduate level courses she teaches at WSU. Her expertise, therefore, encompasses the methods and procedures used to conduct scientific research, as well as assessment of the reliability of scientific research. Dr. Fournier is the editor for two peer-reviewed psychology journals, a consultant to the United States Air Force and has published 23 articles in peer-reviewed journals. A copy of Dr. Fournier's VITA is attached as Exhibit "D" to the Park Declaration.

In conducting her assessment, Dr. Fournier reviewed eight research articles and papers published by William Lewinski and William Lewinski's dissertation published by University

Page 7 -  MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE
           "EXPERT" TESTIMONY OF WILLIAM LEWINSKI

Microfilms International as partial fulfillment for his Ph.D. in Police Psychology.  Fournier

Decl., ¶ 5, pp. 3-5.  Copies of these articles, papers and the dissertation are attached as

attachments 1 through 9 to Dr. Fournier's declaration.[4]

Dr. Fournier conducted a peer review of Dr. Lewinski's Ph.D. dissertation titled: "Calm

in the Face of Death: A Training Program for Maximizing Performance in Crisis Decision

Making".  Dr. Fournier found several major problems with the research that rendered it

scientifically invalid and unreliable.  The problems included Dr. Lewinski's failure to use a

control group (which, alone, invalidated the research and any reliable interpretation of data) and

failure to take appropriate measures to reduce the influence of demand characteristics in the data

collection and rule out experimenter bias.  According to Dr. Fournier, Dr. Lewinski's dissertation

was "more of an introspective, philosophical text guided toward self-promotion and development

of a product for marketing (slide presentation on training techniques developed by the author)

with no empirical research to validly show or even suggest that the marketing tool would be

effective in improving training of police officers".  Fournier Decl., attachment 14, ¶ 1.  Most

significantly, the dissertation "demonstrates a lack of knowledge William Lewinski has

concerning research design and a lack of understanding he has in terms of what can and cannot

be concluded based on one's research design".  Fournier Decl., pp.10-11, ¶ 11.

The articles reviewed are believed to be representative of Dr. Lewinski's research in both

of the subject areas upon which his testimony is offered in this case.  The "Attention Study",

---

[4]Submission of Dr. Lewinski's research articles is necessary so that the trial court can
make its own determination whether the studies are "scientific" and whether the reasoning or
methodology underlying the testimony is scientifically valid.  *United States v. Rincon*, 28 F3d
921, 924 (9th Cir 1994).

Page 8 -  MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE
        "EXPERT" TESTIMONY OF WILLIAM LEWINSKI

attachment 1, was specifically referenced by Dr. Lewinski as support for his opinions concerning Deputy Gerba's and Officer Pastore's attention and memory. *See,* Lewinski Report, p. 6, ¶ 1.  Dr. Lewinski's expert report does not reference specific research supporting his opinions in the field of mental chronometry offered on Deputies Gerba's and Mateski's shooting and stop shooting responses, although it is a fair inference that Dr. Lewinski is relying on the research described in his articles titled "Biomechanics of Lethal Force Encounters - Officer Movements", attachment 3, and "An examination of police officer mental chronometry: 'I swear . . . I don't know how I shot him in the back'", attachment 5.

Upon review of these materials, Dr. Fournier observed that most of Dr. Lewinski's research "ignores basic concepts in research design, hypothesis testing, internal validity and reliability."  Fournier Decl., p. 5, ¶ 6.  With very few exceptions, Dr. Fournier found that Dr. Lewinski's research "is not internally valid or reliable due to 1) flaws (confounds) in research methodology, 2) the lack of statistical comparisons among conditions, and/or 3) conclusions drawn based on manipulations that were not incorporated in the research design."  *Id.*  One very surprising and significant flaw in research methodology is Dr. Lewinski's use of the "subtractive method" to calculate the time required to perform different cognitive processes and physical movements.  Fournier Decl., pp. 6-8, ¶ 8.  The unreliability of this method is taught in graduate level courses and demonstrates that Dr. Lewinski "does not understand mental chronometry in general." *Id.*  Further, in numerous instances, Dr. Lewinski drew conclusions that were not possible based on the experimental design and analyses.  Fournier Decl., pp. 8-11, ¶¶ 9, 10, 11, 13.

/ / /

Page 9 -  MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE
             "EXPERT" TESTIMONY OF WILLIAM LEWINSKI

The unreliability of Dr. Lewinski's research and the conclusions and opinions drawn from that research is reinforced by Dr. Fournier's  examination of the peer-reviewed status of his writings and the general reputation (impact scores) of the publications in which his writings have been published.  Dr. Lewinski has claimed under oath in a declaration filed December 18, 2009 in *Lopez v. Chula Vista Police Department, et al*, United States District Court, Southern District of California, Case No. 07-CV 01272, Exhibit "E" to Park Declaration, that "every research project written by me, my firm, or in collaboration with other colleagues has been peer-reviewed and published in peer-reviewed journals".   Dr. Fournier concluded that assertion was false and regarded it highly questionable whether any of Dr. Lewinski's published research on any topic would qualify as peer reviewed, Fournier Decl., pp. 14-19, ¶¶ 16-19.  None of the periodicals which published Dr. Lewinski's work had an impact score, an indication that the publications were not reputable scientific journals.[5]  *Id*.

Dr. Fournier also found that the content of Dr. Lewinski's writings, inclusive of his report in this case, revealed a demonstrable lack of understanding and expertise in the subject matter. Dr. Fournier identified many claims made by Dr. Lewinksi that were either false, unsupported by any data, or in conflict with the present state of scientific knowledge and research in the field. For example, Dr. Lewinski's statement that "long term memory is limited in capacity" is false, Fournier Decl., p. 11, ¶ 13, Dr. Lewinski's opinion that false memories may affect the sequencing of events is unsupported by any data, Fournier Decl., p. 12, ¶ 14, and Dr. Lewinski's

Dr. Lewinski has also claimed to have published peer-reviewed articles in Police Quarterly and the Executive Research Forum, neither of which are scientific journals.  See Ex. D to Park Decl., excerpts from Lewinski's trial testimony in *Estate of Jordan Case v. Glenn Howard*, US District Court, Oregon, 08-CV-417 KI.

opinion that a person's memory immediately following a stressful event is less reliable than a person's memory at later time (24 to 48 hours after the event) conflicts with the majority of research in the field.,  Fournier Decl., pp. 19-20, ¶¶ 20-21.

Finally, Dr. Lewinski has not reliably applied scientific methods and principles to the facts of this case.   There are at least two critically important events/disputed issues of fact upon which Dr. Lewinski proffers opinion testimony: (1) When lethal fire erupted, was Lukus Glenn charging towards the unlocked/broken door to his parents' home (if so, some bullets should have struck him in his side, rather than all striking his back) or was he retreating towards the porch of his grandmother's apartment?  (2) Do the false statements defendant Gerba made to investigating detectives within a few days of the shooting about the existence of a substantial time gap between the cessation of bean bag fire and the movements of Lukus Glenn which precipitated lethal fire evince a consciousness of wrongdoing/guilt?  As to the first, Dr. Lewinski opines that Mr. Glenn "could have and apparently did change his direction of travel away from his parents' location" before the officers "begin to engage with gunfire".  Lewinski Report, p. 9, ¶ 4. As noted by Dr. Fournier, this opinion is derived from flawed research studies of officer reaction/trigger pull times, an unstated assumption or measurement of the time between Mr. Glenn's movement and shots fired and a very poor grasp of mental chronometry.  Fournier Decl., pp. 20-21, ¶¶ 24-26.   As to the second, Dr. Lewinski opines that stress, speed of the event, timing of the detective interview and other factors may have created false memories or produced sequencing errors in Deputy Gerba's memory.   This opinion is completely unsupported by the research referenced in his report and, with respect to accuracy of recall based on later versus earlier interview timing,

/ / /

Page 11 -  MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE
          "EXPERT" TESTIMONY OF WILLIAM LEWINSKI

contradicts scientifically reliable research on memory.  Fournier Decl., pp. 8-10, ¶¶ 9-10, p. 12,

¶ 14, and pp. 19-20, ¶¶ 20-22.

> 2.    <u>William Lewinski's testimony must be excluded because it will not assist the jury,
> improperly bolsters the credibility of defendant Gerba and invades the province of
> the jury in determining witness credibility.</u>

To be admissible under Rule 702, expert testimony must "assist the trier of fact to

understand the evidence or to determine a fact in issue".  Thus, expert testimony is admissible

only if it concerns matters beyond the understanding of the average lay person.  Expert testimony

is of no assistance if it offers nothing more than what lawyers for the parties can argue in closing

argument.  *See* 4 Weinstein's Federal Evidence § 702.03[2][a].   It is well-established that an

expert witness is not permitted to testify specifically about a witness's credibility or to testify in

such a manner as to "improperly buttress" a witness's credibility.   *See, e.g., United States v.*

*Binder*, 769 F2d 595, 602 (9th Cir 1985) (because credibility is an issue for jury, psychiatric

experts may not testify specifically as to credibility or buttress credibility improperly)*, overruled*

*on other grounds, U.S. v. Morales*, 108 F3d 1031, 1035 n. 1 (9th Cir 1997); *United States v.*

*Awkard*, 597 F2d 667, 671 (9th Cir 1979) (error to permit an expert to testify to the ability of a

witness to recall a stabbing);  *Nimely v. City of New York*, 414 F3d 381, (2nd Cir 2005) (error to

admit expert testimony that shooting officers "misperceived" the suspect turning towards them).

The fallibility of human perception and memory are generally considered to be within the ken of

the average juror.  *United States v. Christopher*, 833 F2d 1296, 1299-1300 (9th Cir 1987)

(affirming exclusion of expert testimony regarding fallibility of eye witnesses).

In the present case, Dr. Lewinski's proffered testimony does little other than improperly

comment, frequently in a highly speculative manner, upon the credibility of defendant Gerba in a

manner designed to bolster his credibility.  Dr. Lewinski proposes to tell the jury which

statements of defendant Gerba are accurate and which statements are 'memory errors' rather than

lies.  Examples pervade Dr. Lewinski's expert witness statement:

- "Errors in memory and perception are consistent with this type of incident."  p. 6, ¶ 2

- "Inaccuracy in reporting correct sequences is also noted as a classical problem in this type of incident . . . [and] has a higher probability of occurring under certain types and timing of an interview about that incident."  p. 7, ¶ 4.

- "interviews done in close proximity to the incident can generate significant emotional arousal during the interview, thus impairing the officer's ability to . . . accurately respond to the questions asked of them."  p. 7, ¶ 6.  Dr. Lewinski did not interview Deputy Gerba and, therefore, it is purely speculative whether Gerba experienced emotional arousal.

- "lack of sleep . . . means . . . he is likely going to make errors" during the interview.  p. 7, ¶ 7.  This testimony characterizes Gerba's false description of the sequence of events as an "error", as opposed to a lie, and is wholly unsupported by fact -- there is no evidence that Gerba lacked *adequate* sleep such that he was cognitively impaired at the time of the interview.

- "the fact that both of the officers started quickly firing may well be an indication of their perception that this was truly a very dangerous situation that demanded immediate response - if not to save themselves - to save the family."  p. 8, ¶ 1.

- "Mr. Glenn certainly could have and apparently did shift his direction of travel away from his parents' location toward the grandmother's location . . . This means the decision to shoot occurred as he was moving toward his parents' location but the officers could not begin to act upon that decision and engage with gunfire until he had turned toward his grandmother's location." p. 9, ¶ 4.

- "Deputy Gerba notes his behavior during the incident as it related to the wheelbarrow. . . This observation . . . would generally have a very high degree of factual accuracy in placing the officer at a site location . . . The factual accuracy of this type of memory stands out significantly compared [to] the subjective estimate of distance between the officer and the subject that is provided at some point later by the officer." p. 10, ¶ 1.

Page 13 -  MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE
        "EXPERT" TESTIMONY OF WILLIAM LEWINSKI

Because of the powerful and potentially misleading effect of expert testimony, otherwise admissible opinions may still be excluded under Rule 403 where the probative value is substantially outweighed by its potential to confuse or mislead the jury.  In weighing possible prejudice against probative value, it is necessary for trial judges to exercise more control over experts than over lay witnesses.  *Daubert, supra*, 509 US at 595.  Even were Dr. Lewinski's opinions relevant, their tendency to confuse and mislead greatly outweigh their probative value.

### Conclusion

Dr. Lewinski's expert testimony is based on scientifically invalid research, is unreliable and is of no assistance to the jury.  Plaintiff respectfully requests that it be excluded in its entirety.

DATED:  June 28, 2012.

/s/ David D. Park
LAWRENCE K. PETERSON, OSB #83006
MICHAEL A. COX, OSB #93507
DAVID D. PARK, OSB #80335
Of Attorneys for Plaintiff